**In re William O'CALLAGHAN, Debtor.**

**Amin T. Bishara, Plaintiff,**

**v.**

**William O'Callaghan, Defendant.**

**Bankruptcy No. 99–14794–8G7.**
**Adversary No. 00–243.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 6, 2003.

John A. Anthony, Esquire, and Stephanie M. Biernacki, Esquire, Gray Robinson, P.A., Tampa, FL, for Plaintiff.

Buddy D. Ford, Esquire, Tampa, FL, for Defendant/Debtor.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for final evidentiary hearing to consider the

Debtor's Objection to Claim Number 2 of Amin T. Bishara, and also to consider the Amended Complaint filed by Amin T. Bishara against the Debtor, William O'Callaghan, to determine the dischargeability of a debt claimed by Bishara and to deny the Debtor's discharge.

## Background

Tier Environmental Services, Inc. (Tier) was a publicly traded company that was involved in the remediation of petroleum contamination. (Transcript, IV–7, IV–8). William O'Callaghan (O'Callaghan) was neither an officer nor a director of Tier. O'Callaghan was, however, the president of H.B. London, a firm that was engaged in the business of "providing financial public relations and management consulting services," and which had entered into a Business Consulting Agreement with Tier. (Bishara's Exhibit 64). O'Callaghan also held a majority of the proxies, or "represented over 50 percent of the outstanding shares," of Tier at unspecified times. (Transcript, Vol.IV, pp. 92–93).

Plant Technical Services, Inc. (PTS) was a "utilities consulting and technology firm" that was formed in 1984. (Bishara's Exhibit 1; Transcript, I–82). Amin T. Bishara (Bishara) was the principal and sole owner of PTS prior to September of 1995.

In 1994, PTS entered into a contract with HEMYC de Mexico, S.A. to provide equipment and related services for a decontamination facility associated with a power station near Veracruz, Mexico (the Mexico project). (Bishara's Exhibit 5; Transcript, I–89). PTS required financing to commence the project, however, and began to look for private investors in the latter part of 1994. (Transcript, I–90). In mid–1995, Bishara was introduced to Tier as a potential source of funding. (Transcript, I–91).

On September 7, 1995, Tier issued a Letter of Intent Regarding Acquisition of Plant Technical Services, Inc. by Tier Environmental. (O'Callaghan's Exhibit 1). The Letter of Intent refers to the Mexico project in connection with the purchase price to be paid for PTS's stock. (O'Callaghan's Exhibit 1, p. 2). On September 26, 1995, however, Tier addressed a letter to Bishara in which the Mexico project was discussed as follows:

In reference to Tier's commitment to future growth and acquisition as it pertains to Grupo Hemyc, we feel that is [sic] it is premature at this time to discuss Hemyc, as it is not an immediate concern of our deal. Our intent is to have a deal with PTS and after that deal is consummated, we can proceed with the details on Hemyc.

(O'Callaghan's Exhibit 4). Tier's letter was written in response to Bishara's inquiry as to "how and when funds will be available" to finance the Mexico project. (O'Callaghan's Exhibit 3).

On September 29, 1995, Tier and PTS entered into an Agreement and Merger Plan (the Agreement). (O'Callaghan's Exhibit 6). Generally, the Agreement provided for the acquisition by Tier of all of the stock of PTS. The terms of the Agreement included the following:

.     .     .     .     .

2. *Exchange of Shares.* Acquiror [Tier] and Stockholders [Bishara] agree that all the issued and outstanding shares of common stock of Acquiree [PTS] shall be exchanged with Acquiror for common stock valued at Seven Hundred Fifty Thousand USD ($750,000), $.032 par value, (the "Common Stock") of Acquiror, valued at the date of the Closing, and an additional compensation of Seventy Five Thousand (75,000) preferred shares (the "Preferred stock") of Acquiror, $10 par value, representing an additional Seven Hundred Fifty Thou-

sand USD ($750,000) at the date of the closing.

. . . . .

7. *Conditions Precedent to the Obligations of Acquiree and Stockholders.* All obligations of Stockholders and Acquiree under this agreement are subject to the fulfillment, prior to or as of the Closing Date, of each of the following conditions:

. . . . .

(c) The present directors of Acquiror will recommend the appointment of a member of Acquiree's management, namely Amin T. Bishara, to the Board of Directors of Acquiror at closing.

. . . . .

12. *Additional Representation and Provisions.*

. . . . .

(c) Acquiror hereby agrees to compensate stockholder Three Hundred Twenty Thousand USD ($320,000) in cash in the following manner: the first One Hundred Thousand USD ($100,000) at closing, and the remaining Two Hundred Twenty Thousand USD ($220,000) within One Hundred Eighty (180) days of the closing date. In addition, there will be a promissory note executed by Acquiror in the amount of Nine Hundred Thousand USD ($900,000) payable to stockholders in five (5) equal installments as outlined in the note, exhibited under attachment "A" herein. Also, there will be employment agreements entered into with key personnel of Acquiree as exhibited under attachment "B" herein.

(e) Acquiree shall become a wholly owned subsidiary of Acquiror and shall continue to function in its usual capacity as such.

(O'Callaghan's Exhibit 6, pp. 3, 11, 17–18) The Agreement also provided for the exchange and delivery of various financial statements and records as between Tier and PTS. (O'Callaghan's Exhibit 6, pp. 5, 7).

The Agreement does not expressly refer to the Mexico project.

The Agreement closed on September 29, 1995. (Bishara's Exhibit 21). In connection with the transaction, a Non–Negotiable Promissory Note dated September 29, 1995, was executed by Warren Douglas Cattanach (Cattanach), as president and chairman, on behalf of Tier. (O'Callaghan's Exhibit 7). The Promissory Note was executed in favor of Bishara in the principal amount of $900,000, payable in annual installments of $225,410.81 commencing on March 1, 1996.

An Employment Agreement was also executed on September 29, 1995, in connection with the transaction. (O'Callaghan's Exhibit 9). The Employment Agreement provided in part:

1. *Employment.* Effective September 29, 1995, PTS does hereby employ and retain Mr. Bishara to serve as President and CEO of PTS and Mr. Bishara hereby accepts the position of President and CEO of PTS and agrees to devote his full professional time and energies to perform his duties in a faithful and industrious manner, as President and CEO of PTS of Texas, a wholly owned subsidiary of Tier Environmental Services, Incorporated ("TIER").

. . . . .

3. *Compensation.* PTS agrees to pay Mr. Bishara as compensation for the performance of his duties as President and CEO of PTS an annual salary of One hundred fifty thousand USD ($150,-000).

. . . . .

5. *Term and Termination of Agreement.*

(a) This Employment Agreement shall be effective as of September 29, 1995, for a term of five (5) years, with an option in his favor to extend for an additional five year period unless terminated as provided herein.

. . . . .

7. *Board of Directors.* Mr. Bishara will retain a seat on the Board of Directors of TIER as long as the terms of this contract extend.

The Employment Agreement was signed by Bishara as the employee and President and CEO of PTS, and was also signed by Cattanach as chairman of Tier.

On October 5, 1995, approximately five days after the transaction closed, Bishara received a check in the amount of $100,000 from Tier. (Bishara's Exhibit 13).

Almost immediately after the closing, issues began arising between PTS and Tier regarding the Mexico project. On October 16, 1995, for example, Bishara sent Cattanach a letter regarding a determination as to "when and who is responsible to raise needed funds to accommodate" the Mexico project ($950,000). (Bishara's Exhibit 17). In December of 1995, Bishara wrote O'Callaghan that funding in an amount between $268,000 and $294,000 was needed by December 22, 1995, for the Mexico project. (Bishara's Exhibit 22). Additionally, on April 16, 1996, Cattanach wrote Bishara a memorandum expressing concern as to Bishara's disposition of money sent to PTS from the Mexico project. (Bishara's Exhibit 41).

Bishara's employment with PTS was terminated on May 6, 1996. (O'Callaghan's Exhibit 10). On that date, Cattanach, as chairman of PTS, wrote a letter informing Bishara of the immediate termination of his employment agreement and his immediate removal as president and CEO of PTS. The reasons stated in the letter for the termination were: (1) Bishara's failure to devote his time and energies to perform his duties in a faithful and industrious manner; (2) Bishara's fraudulent misuse of funds provided to PTS; (3) Bishara's activities seeking to usurp corporate opportunities of PTS for his own personal benefit; and (4) Bishara's false representations made to PTS and its parent corporation.

I. **O'Callaghan's Objection to Bishara's Claim.**

O'Callaghan filed a petition under chapter 7 of the Bankruptcy Code on September 10, 1999.

On April 21, 2000, Bishara filed a proof of claim in O'Callaghan's bankruptcy case. The claim, which was assigned Claim Number 2, was filed as an unsecured claim in the amount of $1,765,000. The claim states that it is based on "fraud, tortious interference, etc."

Two documents are attached to Bishara's Proof of Claim. First, Bishara attached a copy of a complaint that had been filed in the state court in Texas in May of 1997. The complaint includes a claim by Bishara against O'Callaghan for "tortious interference and conspiracy." Specifically, Bishara alleged that O'Callaghan had knowledge of the Employment Agreement between Bishara and PTS, and that O'Callaghan willfully and intentionally induced PTS to breach the Employment Agreement by terminating Bishara's employment.

Second, Bishara attached a copy of an amended complaint that had been filed in Pinellas County, Florida in 1998. The amended complaint includes a claim by Bishara against O'Callaghan for fraud in the inducement, and also includes a claim

against O'Callaghan for negligent misrepresentation. Both claims relate to Bishara's agreement to sell his stock in PTS to Tier under the Agreement and Merger Plan.

O'Callaghan filed a written Objection to Bishara's claim. In the Objection, O'Callaghan essentially contends that (1) there is no debtor/creditor relationship between O'Callaghan and Bishara; (2) there is no contractual relationship between O'Callaghan and Bishara; and (3) O'Callaghan never received any money or economic benefit from Bishara.

## A. Burden of proof

■■■ The relative burdens of proof with respect to objections to claims are well-established.

The burden of proof with regard to most bankruptcy claims is determined by § 502(a) of the Bankruptcy Code, 11 U.S.C. § 502(a)(1994), which states that claims are allowed unless a party in interest objects, and Fed.Bankr.R. 3001(f), which provides that a proof of claim shall constitute prima facie evidence of the validity and amount of the claim. "The debtor, however, need only present evidence supporting its objection ... to shift the burden of proving the claim back to the claimant." *In re Rasbury,* 141 B.R. 752, 757 (N.D.Ala. 1992). In virtually all bankruptcy claims, then, the ultimate burden of persuasion with regard to disputed claims rests with the claimant.

*In re Arndt,* 201 B.R. 853, 857 (M.D.Fla. 1996). "The party objecting to the claim has the burden of going forward with equivalent probative evidence to rebut the presumption of validity and amount. *In re Fleming,* 258 B.R. 488, 489 (Bankr. M.D.Fla.2000). Once the objecting party has rebutted the presumption, the claimant has the ultimate burden of proving its

claim." *In re Tomasevic,* 275 B.R. 86, 96 (Bankr.M.D.Fla.2001).

## B. Fraud in the inducement

The Court finds that Bishara has not established that O'Callaghan fraudulently induced him to enter into the Agreement and Merger Plan.

■■■ To establish a claim for fraud in the inducement, a plaintiff must show:

1. A misrepresentation of a material fact;

2. That the representor of the misrepresentation knew or should have known of the statement's falsity;

3. That the representor intended that the representation would induce another to rely and act on it; and

4. That the plaintiff suffered injury in justifiable reliance on the representation.

*Hillcrest Pacific Corporation v. Yamamura,* 727 So.2d 1053, 1055 (Fla. 4th DCA 1999). See also *Azam v. M/I Schottenstein Homes, Inc.,* 761 So.2d 1195, 1196 (Fla. 4th DCA 2000).

■■■ In this case, Bishara primarily contends that O'Callaghan falsely represented to him that Tier would provide funding to PTS after the merger for PTS's work on the Mexico project. In the complaint filed in Florida in 1997, as attached to Bishara's proof of claim, for example, Bishara alleged that O'Callaghan orally represented that Tier "was more than willing and capable of financing a project in Mexico," and that there "would be no problem in financing both the acquisition of Bishara's company and going forward with the Mexican project." (Amended Complaint attached as Exhibit 2 to Bishara's Proof of Claim No. 2, ¶¶ 5, 8, 11). Additionally, Bishara asserted that "O'Callaghan led Bishara to believe that raising $950,000.00 for the laundry project would not be a problem for

Gulfstar [Tier's successor]," that "O'Callaghan repeatedly assured Bishara that he did not see any problem with raising the money needed by PTS," that O'Callaghan "misrepresented the ability of Gulfstar to fund PTS' Mexican project," and that "at the time of the acquisition, O'Callaghan had no present intention to give the funding to PTS that it required." (Doc. 138, Bishara's Post–Trial Memorandum, pp. 10, 19, 20).

The Court finds that Bishara did not satisfy his ultimate burden of proving that O'Callaghan fraudulently induced him to enter into the Agreement and Merger Plan by representing that Tier would fund PTS and the Mexico project.

First, the evidence does not conclusively establish that O'Callaghan controlled Tier, or that Bishara justifiably relied on any representations that O'Callaghan made on behalf of Tier. To support this conclusion, the Court considers the following testimony:

1. O'Callaghan was not present at the first two meetings following Bishara's initial approach to Tier. (Transcript, Testimony of Warren Cattanach, IV–10).

2. Cattanach asked O'Callaghan to attend subsequent meetings with Bishara because O'Callaghan would ultimately be responsible, through H.B. London, for raising the capital to complete the merger. (Transcript, Testimony of Cattanach, IV–13).

3. O'Callaghan had no corporate authority to act on behalf of Tier or to make any binding decisions on behalf of Tier. (Transcript, Testimony of Cattanach, IV–20).

4. O'Callaghan did not negotiate with Bishara for the acquisition of Bishara's stock by Tier, did not represent to Bishara that he was the principal investor and party in control of Tier, and did not

in fact control Tier prior to July of 1997. (Transcript, Testimony of O'Callaghan, VIII–98 through VIII–101).

Additionally, O'Callaghan did not execute any documents on behalf of Tier prior to the date on which the merger closed. The transactional documents and all correspondence leading up to the transaction were signed by Cattanach on behalf of Tier. The Letter of Intent dated September 7, 1995, and the letter from Tier to Bishara dated September 26, 1995, for example, were both signed by Cattanach on behalf of Tier. (O'Callaghan's Exhibits 1, 4). No documents that pre-date the merger were signed by O'Callaghan.

Second, the evidence does not conclusively establish that O'Callaghan ever represented to Bishara that Tier would fund the Mexico project for PTS. To support this conclusion, the Court considers the following testimony:

1. Neither O'Callaghan nor Tier ever issued a written commitment to fund the $950,000 required for the Mexico project. (Transcript, Testimony of Bishara, III–72).

2. O'Callaghan never represented to Bishara that Tier had sufficient assets to fund the acquisition of PTS and the Mexico project, and never gave Bishara any financial statements to assure him that Tier could finance the Mexico project. (Transcript, Testimony of O'Callaghan, VIII–102).

3. Tier did not make a commitment to fund the Mexico project at the meetings conducted to negotiate the merger, and did not consider the Mexico project as a component of the merger with PTS. (Transcript, Testimony of Cattanach, IV–14,15, IV–23,24).

Additionally, in Cattanach's letter to Bishara dated September 26, 1995, just three days before the scheduled closing, Catta-

nach wrote that "it is premature at this time to discuss Hemyc [the Mexico project], as it is not an immediate concern of our deal," and further wrote that Tier's intent was to have a deal with PTS, "and after that deal is consummated, we can proceed with the details on Hemyc." (O'Callaghan's Exhibit 4).

Finally, the testimony presented at trial indicates that Cattanach, rather than O'Callaghan, delivered Tier's financial records to Bishara, and that O'Callaghan actually attempted to discourage Cattanach from proceeding with the merger plans. (Transcript, Testimony of Cattanach, IV–21,22; Testimony of O'Callaghan, VIII–7,8; VIII–103; VIX–19). Additionally, the testimony and documentary evidence indicates that Bishara was aware that certain of Tier's assets, referred to as "the MBT real estate," would not be dedicated to the funding of the Mexico project. (O'Callaghan's Exhibit 4; Transcript, Testimony of Bishara, VIX–77; Testimony of Cattanach, IV–22, 83).

Based on this evidence, the Court determines that Bishara did not establish that O'Callaghan fraudulently induced him to enter the Agreement and Merger Plan by representing that Tier would fund the Mexico project for PTS.

### C. Tortious interference

The Court finds that Bishara did not establish that O'Callaghan tortiously interfered with Bishara's employment agreement with PTS.

█ To establish a claim for tortious interference, a plaintiff must show:

1. The existence of a business relationship;

2. the defendant's knowledge of the relationship;

3. the defendant's intentional and unjustified interference with the relationship; and

4. damage to the plaintiff as a result of the breach of the relationship.

*St. Johns River Water Management District v. Fernberg Geological Services, Inc.,* 784 So.2d 500, 504 (Fla. 5th DCA 2001). See also *Chicago Title Insurance Company v. Alday–Donalson Title Company of Florida, Inc.,* 832 So.2d 810, 814 (Fla.App. 2 Dist.).

Bishara asserts that O'Callaghan had knowledge of the Employment Agreement that he entered with PTS, and that O'Callaghan willfully and intentionally induced PTS to breach the Employment Agreement by causing PTS to terminate Bishara's employment. (First Amended Original Petition attached as Exhibit 1 to Bishara's Proof of Claim No. 2, ¶ 43).

Bishara's evidentiary support for his contention arises primarily from the testimony of George Fiske (Fiske). Fiske testified that he was initially contacted by O'Callaghan with respect to performing "a due diligence-type analysis and fact-finding on the HEMYC or Mexican situation or company." (Transcript, IV–122). After meeting with both O'Callaghan and Cattanach, Fiske entered into a Consulting Services Agreement with Gulfstar Industries, Inc. (Tier's successor) on February 26, 1996. (O'Callaghan's Exhibit 19). O'Callaghan signed the Consulting Agreement as "Assistant to the Chairman" for Gulfstar. Pursuant to the Agreement, Fiske was employed by Gulfstar as a consultant for an initial term of two months.

During the initial term, however, it appears that Fiske's duties under the Consulting Agreement were modified from the original "due diligence" task. In this regard, Fiske testified:

There was a feeling of mistrust by Mr. Cattanach and Mr. O'Callaghan. And

there was a question in their minds of not only could they, but how could they, terminate Mr. Bishara and still stay within the legal boundaries of the employment contract, etc.

I was asked to pull together the facts, details, et cetera, to put it in an organized fashion. And that's what this document is.

(Transcript, IV–130). The document referred to by Fiske is a report dated March 18, 1996, that was prepared by Fiske and addressed to O'Callaghan. (O'Callaghan's Exhibit 19). The purpose of the report, according to the memorandum, was to "suggest a course of action to take, to resolve the current unsatisfactory situation regarding the performance of the President and CEO of PTS and Grupo Hemyc." The report then identifies six different "items" representing Bishara's "default of his duties," and five different correctional actions that should be undertaken by Bishara. (O'Callaghan's Exhibit 19).

A report that was authored by Fiske on April 15, 1996, includes the following recommendations:

File a suit against Amin for withholding information about the PTS purchase. Don't serve yet.

Time critical—Remove Amin from PTS activities based on his total effort being spent at Hemyc, and is needed at Hemyc. PTS needs attention that he can't give....

(O'Callaghan's Exhibit 19). Bishara was terminated on May 6, 1996. (O'Callaghan's Exhibit 10).

■ Notwithstanding O'Callaghan's involvement in hiring Fiske, the Court finds that Bishara did not satisfy his ultimate burden of proving that O'Callaghan tortiously interfered with Bishara's Employment Agreement with PTS. On the contrary, the evidence shows that the termination of Bishara's employment is likely to have been caused by Bishara's own pre-merger nondisclosures and post-merger conduct, rather than by any interference of O'Callaghan.

## 1. Nondisclosure

Prior to the closing of the merger, Bishara furnished certain statements to Tier regarding the financial status of PTS. (O'Callaghan's Exhibit 5).

After the merger, Tier discovered that certain information regarding PTS had not been disclosed or had been disclosed inaccurately. As Cattanach testified, "It was shortly after the merger that we began to have to supply funds to PTS when, in fact, we thought based on the information we'd gotten prior to the merger that PTS was fairly solid and could pay its own bills." (Transcript, Testimony of Cattanach, IV–32). The undisclosed or inaccurately disclosed information includes the following:

1. PTS had failed to make required contributions to its 401K pension plan. (Transcript, Testimony of O'Callaghan, VIII–24–25; Bishara's Exhibit 73, First Amended Disclosure Statement of Gulfstar Industries, Inc., p. 15).

2. The United States Customs was holding equipment that was being shipped to the Mexico project, pending the payment of the sum of $70,000. (Transcript, VIII–14).

3. PTS's Balance Sheet that was included in the closing package reflects a "long-term contract receivable" in the amount of $366,898. (Bishara's Exhibit 21, Tab 9). Bishara conceded at trial, however, that the entry related to the Mexico project, and that PTS would "have to finish the work in order to collect," so that the amount on the balance sheet was not a true receivable suitable for factoring. (Transcript, Testimony of Bishara, VIX–92,93).

4. Several entities were asserting claims against PTS, such as Westinghouse Electric Corporation for the approximate sum of $355,000, and National Nuclear Corporation for the approximate sum of $22,772.50. (O'Callaghan's Exhibits 8, 30). Additionally, Frank Corris, the director of operations for PTS, testified that PTS was not making payments to vendors as they became due at the time of the merger with Tier. (Transcript, Testimony of Frank Corris, II–21; II–59).

5. PTS periodically did not have enough money to make its payroll. (Transcript, Testimony of O'Callaghan, VIII–35; O'Callaghan's Exhibit 19).

In summary, Corris testified that Bishara was present at a meeting of PTS employees shortly after the merger, and that Bishara told Corris that Bishara "had basically sold an insolvent company for well over a million dollars." (Transcript, Testimony of Corris, II–20,21).

### 2. Post-merger conduct

Shortly after the merger, Tier became aware of certain irregularities in connection with PTS's factoring arrangement with KBK Financial. Specifically, Frank Corris testified that one of PTS's clients had mistakenly sent a check to PTS instead of to the factor, and Bishara directed that the check be deposited directly into PTS's account, in violation of the factoring agreement. KBK subsequently terminated its arrangement with PTS. (Transcript, Testimony of Corris, II–32; Testimony of O'Callaghan, VIII–11).

Additionally, the Court finds other testimony of Frank Corris to be particularly significant with respect to Bishara's post-merger conduct. Frank Corris was the director of operations for PTS. The testimony of Corris at trial was candid and credible. Corris testified that, at some point after the merger, Cattanach decided that Tier should not proceed with the Mexico project, and that he asked Bishara to concentrate on PTS's American contracts. (Transcript, Testimony of Corris, II–40). Corris then testified as to Bishara's post-merger conduct at length:

A: And Mr. Fiske reiterated that in probably a more calm demeanor and a less colorful demeanor and they had told Mr. Bishara that he was in a probationary status as far as they were concerned.

Q: So, you're saying that Mr. Cattanach and Mr. Fiske put Mr. Bishara on probation at that meeting?

A: Yes, they did.

.    .    .    .    .

Q: Did Mr. Bishara follow the directions of Mr. Cattanach about telling him to focus on the U.S. project and to phase out or abandon the Mexican project?

A: Mr. Bishara flew to Mexico the following Monday.

Q: And how long did he stay there?

A: I don't remember exactly. He usually stayed from Monday through Friday and sometimes for two weeks. But it was definitely an act of defiance.

Q: Do you think it was insubordination?

A: Absolutely.

.    .    .    .    .

Q: Okay. So did Mr. Cattanach ever find out that Mr. Bishara was continuing to stay in Mexico and not attending to business in—of PTS in Texas?

A: Oh, yes. He called the following week and he was not there.

.    .    .    .    .

A: Mr. Cattanach had called and asked if Mr. Bishara had gone to Mexico again. And I said, "Yes, he was in Mexico."

And he said, "Well, I've tried to reach him and I can't seem to get a message to him, can you do that?" And I said, "Yes." And he asked me to set up a meeting for the following—for that upcoming Thursday.

This was early in the week. Set up a meeting in the PTS office for Thursday. And I reached Mr. Bishara in Mexico and told him that Mr. Cattanach wanted to meet with him in our office on that Thursday. And Mr. Bishara did not come to the meeting.

. . . . .

Q: Did he show up the next day?

A: No. The next day was Friday, he did not show.

. . . . .

A: This is my opinion: I'm not sure that Mr. Cattanach was really going to pull the trigger, if you will, until Mr. Bishara didn't show. It was another act of defiance. Mr. Bishara is a very good talker and I felt he could possibly get another stay of execution. But he didn't show. So I think that that evening Mr. Cattanach probably made his own conclusion as to what he was going to do.

. . . . .

A: I understand. The common man would understand that Mr. Bishara was terminated for insubordination. It was very clear.

(Transcript, Testimony of Corris, II–40 through II–48). Mr. Corris's testimony was corroborated by Mr. Cattanach's testimony that Bishara was rarely in the PTS office, and that Bishara "wasn't spending a great deal of time on PTS business. In fact, there had not been any new business, I don't think, brought in in months." (Transcript, Testimony of Cattanach, IV–32,33).

Cattanach signed the Notice of Default and Notice of Termination of Bishara's employment on May 6, 1996. (O'Callaghan's Exhibit 10). As set forth above, the reasons stated in the notice for the action are (1) Bishara's failure to devote his time and efforts to the performance of his duties as president and CEO of PTS; (2) Bishara's fraudulent misuse of funds provided to PTS; (3) Bishara's activities to usurp corporate opportunities belonging to PTS; and (4) Bishara's false representations made to PTS and Tier.

Considering the weight of the evidence, the Court finds that Bishara did not establish that O'Callaghan tortiously interfered with his employment agreement with PTS. Instead, the evidence shows that the termination of Bishara's employment is equally as likely to have been caused by Bishara's own pre-merger and post-merger conduct.

### D. Bishara's claim should be disallowed

For the reasons discussed above, the Court determines that Bishara did not prove his claim for fraud in the inducement, and also did not prove his claim for tortious interference. Consequently, Bishara's Proof of Claim Number 2 should be disallowed.

## II. The adversary proceeding

Bishara commenced this adversary against O'Callaghan by filing a Complaint to determine the dischargeability of a debt, and also to deny O'Callaghan's discharge.

### A. Dischargeability

The action to determine the dischargeability of a debt is based on § 523(a)(2)(A) of the Bankruptcy Code. Specifically, Bishara asserts that his claim against O'Callaghan for fraud in the inducement and tortious interference should be excepted from

O'Callaghan's discharge because of O'Callaghan's false pretenses, false representations, or actual fraud.

Since Bishara's claim is disallowed, as explained above, the cause of action based on § 523(a)(2)(A) should be dismissed. Bishara is not the holder of a claim that is subject to a dischargeability action.

Additionally, Bishara did not prove the cause of action under § 523(a)(2)(A) for the same evidentiary reasons that he did not establish his proof of claim. In other words, Bishara failed to prove that O'Callaghan engaged in any fraudulent conduct that injured Bishara.

### B.  Denial of discharge

In Counts II through VI of the Amended Complaint, Bishara requests that O'Callaghan's discharge be denied.

Count II is an action to deny O'Callaghan's discharge under § 727(a)(2) of the Bankruptcy Code, based on the allegation that O'Callaghan transferred or concealed property within one year before the bankruptcy petition, with the intent to hinder, delay, or defraud creditors. Count III is an action under § 727(a)(3), based on the allegation that O'Callaghan failed to keep or preserve recorded information from which his financial condition might be ascertained. Count IV is an action under § 727(a)(4), based on the allegation that O'Callaghan knowingly and fraudulently made false oaths in connection with his bankruptcy case. Count V is an action under § 727(a)(5), based on the allegation that O'Callaghan has failed to explain satisfactorily a loss of assets. Finally, Count VI is an action under § 727(a)(7), based on the allegation that O'Callaghan intentionally made false oaths and concealed property and material information in the bankruptcy case of Gulfstar Industries, Inc.

■  Section 727(c)(1) of the Bankruptcy Code states:

**11 USC § 727.  Discharge**

.        .        .        .        .

(c)(1) The trustee, *a creditor*, or the United States trustee may object to the granting of a discharge under subsection (a) of this section.

(Emphasis supplied). "In order to have standing to object to the Debtor's discharge and the dischargeability of certain debts, the Plaintiff must be a 'creditor' within the meaning of the Bankruptcy Code.... The Bankruptcy Code defines a 'creditor' as an entity that has a pre-petition claim." *In re Compagnone*, 239 B.R. 841, 842–43 (Bankr.D.Mass.1999). Further, "it is clear that the fact that a proof of claim is challenged and the claim is disputed would not detract from the status of an entity as a creditor *until the claim is ultimately disallowed.*" *In re James*, 166 B.R. 181, 183 (Bankr.M.D.Fla.1994)(Emphasis supplied).

■  Since Bishara does not have an allowed claim in this case, as determined above, he is not a "creditor" entitled to object to O'Callaghan's discharge.

Even if Bishara did have standing to bring the action to deny O'Callaghan's discharge, however, he did not prove any of the causes of action under § 727(a).

To support his allegations under § 727(a), Bishara relied primarily on (1) O'Callaghan's deposition testimony that he used a "pocket account" to conduct his personal business in cash; (2) on O'Callaghan's affidavit in an unrelated bankruptcy case stating that he was a "serious potential purchaser" of property of the estate; (3) on a financial statement signed by O'Callaghan in 1994 that reflects real estate in New York worth $2 million; and (4) on O'Callaghan's deposition testimony that

he had never been convicted of a crime, when in fact he was convicted in 1977 for the receipt of stolen securities. (Bishara's Post–Trial Memorandum, pp. 24–26).

In response, O'Callaghan testified that he was representing a group of investors when he signed the affidavit in the unrelated bankruptcy case (Transcript, VI–94, 95), and that he had only a non-assignable option on the New York real property (Transcript, VI–105, 106).

It is significant that Bishara produced no concrete evidence to show that O'Callaghan previously owned any specific asset, and that the specific asset was either fraudulently transferred or concealed from the bankruptcy estate. See, for example, *In re Brien*, 208 B.R. 255, 258 (1st Cir. BAP 1997)(The plaintiff must show that the debtor at one time owned specific assets, and that the assets are no longer available for the estate); and *In re Hollingsworth*, 224 B.R. 822, 830 (Bankr. M.D.Fla.1998)("The plaintiff has the burden of identifying the assets in question and showing that the debtor at one time had the assets and that the assets are not presently available for creditors.").

Bishara's testimony regarding the action to deny O'Callaghan's discharge is particularly noteworthy:

Q: Do you know anything about Mr. O'Callaghan's assets and liabilities?

A: No.

Q: Do you have any personal knowledge as to what Mr. O'Callaghan owns other than you've seen him in a car?

A: No.

Q: Do you have any personal knowledge about whether or not Mr. O'Callaghan has made any transfers of assets within the year prior to bankruptcy?

A: Not to my knowledge.

Q: You have no personal knowledge.

A: No.

Q: Do you have any personal knowledge as to whether or not that Mr. O'Callaghan has signed any false oaths with regards to his bankruptcy?

A: I don't know.

(Transcript, Testimony of Bishara, III–122, 123).

Bishara did not establish any of the causes of action set forth under § 727(a) of the Bankruptcy Code. O'Callaghan's discharge should not be denied.

## Conclusion

The evidentiary hearing was conducted on O'Callaghan's Objection to Bishara's claim, and also on Bishara's complaint to determine the dischargeability of a debt and to deny O'Callaghan's discharge.

Bishara's proof of claim should be disallowed in its entirety, because he failed to establish either that O'Callaghan fraudulently induced him to enter into the Agreement and Merger Plan, or that O'Callaghan tortiously interfered with Bishara's Employment Agreement with PTS.

Further, a judgment should be entered in favor of O'Callaghan, and against Bishara, in the adversary proceeding. Since Bishara's claim was disallowed, Bishara has no claim in the case that is subject to a dischargeability action, and no standing to object to O'Callaghan's discharge. Even if Bishara did have standing to bring the action, however, Bishara did not establish any basis for denying O'Callaghan's discharge under § 727(a) of the Bankruptcy Code.

Accordingly:

**IT IS ORDERED** that:

1. The Objection to Claim Number 2 of Amin T. Bishara filed by the Debtor, William O'Callaghan, is sustained, and Claim Number 2 of Amin T. Bishara is disallowed.

2. A Final Judgment will be entered in favor of the Debtor, William O'Callaghan, and against the Plaintiff, Amin T. Bishara, with respect to the Amended Complaint to determine the dischargeability of a debt and to deny the Debtor's discharge in Adversary Number 00–243.

3. A separate Final Judgment will be entered consistent with this Opinion.